**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| SANTA CLARITA VALLEY WATER AGENCY, | MDL No.: 2873 |
| Plaintiff, | Master Docket: 2:18-mn-2873-RMG |
| v. | JUDGE RICHARD M. GERGEL |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); NATION FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; CLARIANT CORPORATION; CHEMICALS INCORPORATED; NATION FORD CHEMICAL COMPANY; AGC INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS INC.; DEEPWATER CHEMICALS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; AND JOHN DOE DEFENDANTS 1-49, | Civil Case No.:  2:20-cv-3771-RMG<br><br>DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Santa Clarita Valley Water Agency ("Plaintiff" or "SCVWA"), by and through

its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota

Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours

Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc.,

Chemguard, Inc., Tyco Fire Products LP (successor-in-interest to The Ansul Company), Kidde-

Fenwal, Inc., Kidde PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation Ford Chemical Company, AGC Inc. (f/k/a Asahi Glass Co., Ltd.), AGC Chemicals Americas, Inc., Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants") and alleges as follows:

## SUMMARY OF THE CASE

1.      Plaintiff brings this action against Defendants to recover any and all past and future compensatory and/or consequential damages for the investigation, remediation, treatment, removal, disposal, and/or monitoring of the ongoing contamination of its surface water, groundwater, soil, sediment, water treatment facilities, and other lands, facilities and properties caused and/or created by Defendants' products, as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

2.      Plaintiff owns and operates public water supply systems that supply drinking water to thousands of residences, schools, and businesses within the State of California.

3.      Plaintiff has a property interest in the water it appropriates, treats, stores, and distributes to the public, as well as its water sources, wells, piping, distribution systems, lands, properties and facilities (collectively, "Plaintiff's Property").

4.      Plaintiff's Property has been, and continues to be, contaminated with per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), and/or their chemical precursors.

5.      At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold PFOS, PFOA, the chemical precursors of PFOS and/or PFOA,

and/or products containing PFOS, PFOA, and/or their chemical precursors (collectively, "Fluorosurfactant Products").

6.      Defendants' products made with PFAS include, but are not limited to, Teflon, Scotchgard, waterproofing compounds, stainproofing compounds, waxes, paper and cloth coatings, and aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires.

7.      PFOS and PFOA are man-made compounds that are highly toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety and the environment.

8.      Defendants designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment during the intended use of the Fluorosurfactant Products, even when used as directed and intended by Defendants.

9.      Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, and/or disposed of at and/or in the vicinity of Plaintiff's Property, including Plaintiff's water supplies. During these activities, Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFOS, PFOA and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

10.     As a result of the use of Defendants' Fluorosurfactant Products which, upon information and belief, include those set forth in Paragraph 6 above, for their intended purpose, PFOS, PFOA and/or their chemical precursors have been detected in Plaintiff's Property at substantial levels.

11.      Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

12.      At all times pertinent herein, Plaintiff did not know, nor should it have known, of the ongoing contamination of its Property through the use, release, handling, storage, and/or disposal of Defendants' Fluorosurfactant Products.

13.      Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, treat, remediate, remove, dispose of, and/or monitor the PFOS and PFOA contamination of Plaintiff's Property caused by the handling, storage, release, use, or disposal of Defendants' Fluorosurfactant Products at and/or in the vicinity of Plaintiff's Property, as well as any and all other damages recoverable under California and/or applicable federal laws.  Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, punitive damages, as well as reasonable attorneys' fees and costs.

## **PARTIES**

14.      SCVWA is a California public water agency, formed and existing pursuant to a special act of the Legislature of the State of California, called the Santa Clarita Valley Water Agency Act (the "Act"), with its principal place of business located at 27234 Bouquet Canyon Road, Santa Clarita, California 91350.  Pursuant to the Act, SCVWA is the successor in interest to the Castaic Lake Water Agency, including its Santa Clarita Water Division, the Newhall County Water District, and the Valencia Water Company.  SCVWA operates multiple water divisions including Santa Clarita, Newhall and Valencia, and all water systems and operations thereunder, in a service area of 195 square miles.

15.      Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property:

a. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in California, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including California.

b. Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  DuPont is registered to do business in California.

c. Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours is registered to do business in California.

d. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e. Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in California.

f. Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware

19805.  Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont does and/or has done business throughout the United States, including California.

g. Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in California.

h. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard does and/or has done business throughout the United States, including California.

i. Upon information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC").  Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States.

j. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.  Tyco acquired Chemguard in 2011.

k. Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief,

Tyco/Ansul does and/or has done business throughout the United States, including in the State of California.

l.  Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101.  Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc.  Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc. (collectively, "Kidde/Kidde Fire").  Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in California.

m.  Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032.  Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in California.

n.  Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.  Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

o.  Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach

Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in California.

p.  Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier. Carrier is registered to do business in California.

q.  Defendant Raytheon Technologies Corporation (f/k/a United Technologies Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Raytheon Tech f/k/a United Tech does and/or has done business in California.

r.  Defendant National Foam, Inc. ("NF") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. NF is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, NF manufactures the Angus brand of AFFF products. Upon information and belief, NF does and/or has done business throughout the United States, including in California.

s.  Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Upon information and belief, Buckeye does and/or has done business throughout the United States, including in California.

t.  Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in California.

8

u. Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is registered to do business in California. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including California.

v. Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

w. Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Clariant is registered to do business in California.

x. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF. Chem Inc. is registered to do business in California.

y. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

z. Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its

principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

aa. Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America is registered to do business in California.

bb. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

cc. Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

dd. Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

ee. Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Archroma U.S., Inc. does and/or has done business throughout the United States, including in California.

10

ff. Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

16. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

17. When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

18. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

19. Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the Central District of California. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the

Central District of California as the "Home Venue" as this case may have originally been filed there.

20.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.  THE CONTAMINANTS: PFOS AND PFOA

21.    PFOS and PFOA are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA").  PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").  PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group.  The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent.  PFOS and PFOA contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

22.    PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain.  PFOS and PFOA are considered long-chain PFAAs because they contain eight carbon atoms in their chains; short-chain PFAAs have six or less carbon atoms in their chains.

23.    PFOS and PFOA are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water.  Their

mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

24.    PFOS and PFOA are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water, soil and air, as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[2]

25.    PFOS and PFOA are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

26.    Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOS and PFOA.

27.    According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure to PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

28.    EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS."[5]

---

[1] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[2] *See* EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

[3] *See* EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.

[4] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[5] *See* "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available

29.    EPA has noted that drinking water can be an additional source of PFOA/PFOS in the body in communities where these chemicals have contaminated water supplies. In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [Fluorosurfactant Products] were used for firefighting."[6]

## B. AQUEOUS FILM-FORMING FOAM

30.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

31.    The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS or the chemical precursors to PFOA or PFOS.

32.    PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF"). 3M was the only manufacturer that used ECF; all other AFFF producers manufactured fluorosurfactants for use in AFFF through the process of telomerization, which produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

33.    AFFF can be made without PFOS, PFOA or their precursor chemicals. Fluorine-free and short-chains foams do not release PFOS, PFOA or their precursor chemicals into the environment.

34.    AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where

---

at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[6] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

it works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion.

35.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOS, PFOA and/or their precursor chemicals into the environment.

36.     Once PFOS and PFOA are free in the environment, they do not hydrolyze, photolyze or biodegrade under typical environmental conditions, and are extremely persistent in the environment.  As a result of their persistence, they are widely distributed throughout soil, sediment, surface water and groundwater.

37.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOS, PFOA and/or their precursor chemicals to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff's Property.

38.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff's Property.

**C.  DEFENDANTS' KNOWLEDGE OF PFOS AND PFOA HAZARDS**

39.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOS and PFOA are toxic; and (b) when AFFF containing PFOS, PFOA and/or their precursor chemicals is sprayed in the open environment, per the instructions given by the manufacturer, PFOS and PFOA readily migrate through the subsurface, mix easily with surface water and groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

40.    Defendants also knew, or reasonably should have known, that PFOS and PFOA could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOS and PFOA can persist in the body for prolong periods of time.

41.    In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[7]

42.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

43.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia.  DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects – one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[8]

44.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[9]

---

[7] See Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[8] See Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.
[9] See Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

45.    Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

46.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks such as Forafac 1157 N, for use in the manufacturing of AFFF products.

47.    On information and belief, in 2001 DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Plaintiff's Property.

48.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[10]

49.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[11] The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[12]

---

[10] *See*, *e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

[11] $16.5 million.

[12] U.S.Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005),

50.     By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[13] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[14] By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

51.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

52.     Notwithstanding this knowledge, Defendants negligently and carelessly: (a) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOS, PFOA and/or their precursor chemicals to contaminate Plaintiff's Property, including Plaintiff's water resources; (c) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOS and/or PFOA, of the dangers of surface water, soil, sediment and groundwater contamination as a result of standard use and disposal of these products; and (d) further failed and refused to issue the appropriate warnings and/or recalls

---

https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed on January 30, 2018).

[13] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

[14] *See* The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on January 28, 2018).

to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew or could reasonably ascertain the identities of the purchasers of their Fluorosurfactant Products.

53.    As a direct result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiff's Property has been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, treat, remove, clean up, correct, and/or remediate PFOA and PFOS contamination on its Property at significant expense, loss and damage.

54.    Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. Defendants also had a duty and breached their duty to minimize the environmental harms caused by Fluorosurfactant Products.

### D.  THE IMPACT OF PFOS AND PFOA ON PLAINTIFF'S PROPERTY

55.    PFOS and PFOA have been detected in varying amounts, at varying times, in water extracted from Plaintiff's Property.  PFOS and PFOA have been detected and/or are present in certain of areas of Plaintiff's Property.  It is the contention of Plaintiff that any detectible level of PFOS and/or PFOA in its soil, surface water, groundwater, or elsewhere on its Property requires investigation, treatment, remediation, and monitoring.

56.    The detection and/or presence of PFOS and/or PFOA, and the threat of further detection and/or presence of PFOS and/or PFOA, in Plaintiff's Property in varying amounts and at varying times has resulted, and will continue to result, in significant injuries and damage to Plaintiff.

57.    On information and belief, the invasion of Plaintiff's Property with PFOS and PFOA is recurring, resulting in new harm to Plaintiff on each occasion.

58.     The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

## FIRST CAUSE OF ACTION

STRICT LIABILITY - DEFECTIVE DESIGN - CONSUMER EXPECTATION TEST

59.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

60.     Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing and selling Fluorosurfactant Products.

61.     Plaintiff was harmed by Fluorosurfactant Products which were designed, manufactured, marketed, sold and/or distributed by Defendants, and which were defectively designed and did not include sufficient instructions and warnings of potential safety hazards.

62.     Defendants' Fluorosurfactant Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

63.     Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

64.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

65.     Defendants' Fluorosurfactant Products used on or in the vicinity of Plaintiff's Property were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

66.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into the surface water, soil, and groundwater.

67.     Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

68.     Plaintiff was, is and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

69.     Defendants' Fluorosurfactant Products' failure to perform safely was a substantial factor in causing Plaintiff's harm.

70.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY - DEFECTIVE DESIGN - RISK-BENEFIT TEST

71.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

72.     Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing and selling Fluorosurfactant Products.

73.    Plaintiff was, is and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

74.    The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiff.

75.    The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFOA and PFOS contamination is widespread, persistent and toxic.

76.    The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

77.    At the time of manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in the Products.

78.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

79.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

### THIRD CAUSE OF ACTION

STRICT LIABILITY - FAILURE TO WARN

80.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

81.     Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing and selling Fluorosurfactant Products.

82.     As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and PFOS.

83.     Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

84.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS were real and potential threats to the environment.

85.     Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Plaintiff's Property.

86.     Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

87.     Defendants' Fluorosurfactant Products used on and/or in the vicinity of Plaintiff's Property were defective in design and unreasonably dangerous for the reasons set forth above.

88.     Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products on or near Plaintiff's Property, including contamination of Plaintiff's Property with PFOA and/or PFOS,

Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

89.      In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products.

90.      As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## FOURTH CAUSE OF ACTION

### PUBLIC NUISANCE

91.      Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

92.      Defendants designed, manufactured, distributed, marketed, and/or sold their Fluorosurfactant Products in a manner that created, or participated in creating, a public nuisance that unreasonably and substantially interferes with the use and enjoyment of Plaintiff's Property, and unreasonably endangers or injures the health, safety, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

93.      The unreasonable and substantial interference with the use and enjoyment of Plaintiff's Property includes, but is not limited to: the contamination of Plaintiff's Property, including Plaintiff's water supply source, with PFAS; and the exposure to known toxic chemicals manufactured and/or sold by Defendants.

94.     The presence of PFAS causes significant costs, inconvenience, and annoyance to Plaintiff, who is charged with supplying potable drinking water to residents and businesses in the Santa Clarita Valley area.

95.     The contamination affects a substantial number of people who rely upon Plaintiff for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe drinking water resources and environment.

96.     The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in manufacturing Fluorosurfactant Products and concealing the dangers those Products posed to human health and the environment.

97.     As a result of the actual and threatened PFAS contamination caused by Defendants' conduct, Plaintiff has suffered, and will continue to suffer, harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred, and will continue to incur, substantial costs to remove the contamination from its Property.

98.     Plaintiff did not consent to the conduct that resulted in the contamination of its Property.

99.     Defendants' conduct was a substantial factor in causing the harm to Plaintiff.

100.     Defendants have, by their acts and omissions set forth above, among other things, knowingly unleashed long-lasting and ongoing PFOS and PFOA contamination, and threat of PFOS and PFOA contamination, upon Plaintiff's Property.

101.     Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of Fluorosurfactant Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property.

102.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## **FIFTH CAUSE OF ACTION**

### PRIVATE NUISANCE

103.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

104.     Plaintiff's Property has been, and continues to be, contaminated by PFOS and/or PFOA as a direct and proximate result of the acts and omissions of Defendants as set forth above.

105.     Actual and threatened PFOS and PFOA contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the ordinary safety, use, benefit, and/or enjoyment of Plaintiff's Property.

106.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## SIXTH CAUSE OF ACTION

TRESPASS

107.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

108.    Defendants knew or in the exercise of reasonable care should have known that, even in small amounts, PFOS and PFOA can contaminate water resources and render drinking water unpotable, including water resources utilized by and are the property of public water providers, such as Plaintiff.

109.    Defendants failed to properly warn against the use of Fluorosurfactant Products such that they proximately caused and continue to cause PFOS and PFOA to contaminate Plaintiff's Property, including but not limited to its surface water and groundwater.

110.    The contamination of Plaintiff's Property has varied over time and has not yet ceased. PFOS and PFOA continue to migrate into and enter Plaintiff's Property. The contamination is reasonably abatable.

111.    Plaintiff has not consented to, and does not consent to, this trespass.

112.    Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

113.    Plaintiff is, was, and will continue to be harmed by this trespass.

114.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## SEVENTH CAUSE OF ACTION

NEGLIGENCE - MANUFACTURER OR SUPPLIER - DUTY TO WARN

115.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

116.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

117.    Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

118.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

119.    Plaintiff was, is, and will continue to be harmed by Defendants' negligent conduct.

120.     Defendants' failure to warn or instruct was a substantial factor in causing Plaintiff's harm.

121.     Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

122.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## EIGHTH CAUSE OF ACTION

### NEGLIGENCE – FAILURE TO RECALL

123.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

124.     Defendants' Fluorosurfactant Products were designed, manufactured, marketed, distributed and sold without adequate warning of toxicity, potential human health risks and environmental hazards.

125.     Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with their Fluorosurfactant Products.

126.     Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

127.    Defendants knew or reasonably should have known that users and third parties would not realize the dangers.

128.    Defendants became aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products by no later than the year 2000.

129.    Defendants failed to recall their Fluorosurfactant Products.

130.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of Fluorosurfactant Products.

131.    Plaintiff was, is, and will continue to be harmed by Defendants' negligent conduct.

132.    Defendants' failure to recall their Fluorosurfactant Products was a substantial factor in causing Plaintiff's harm.

133.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

134.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, costs associated with obtaining additional water supplies, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## NINTH CAUSE OF ACTION

### LIABILITY PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1882

135.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

136.     Plaintiff is a public water utility company and operates multiple public water supply systems in California.  The groundwater that supplies Plaintiff's wells is property owned or used by Plaintiff to provide utility services.  The water pumped from Plaintiff's wells is property owned or used by Plaintiff to provide utility services.

137.     California Civil Code Section 1882.1 states, "[a] utility may bring a civil action for damages against any person who commits, authorizes, solicits, aids, abets, or attempts any of the following acts:

    a.  Diverts, or causes to be diverted, utility services by any means whatsoever.

    b.  Makes, or causes to be made, any connection or reconnection with property owned or used by the utility to provide utility service without the authorization or consent of the utility.

    c.  Prevents any utility meter, or other device used in determining the charge for utility services, from accurately performing its measuring function by tampering or by any other means.

    d.  Tampers with any property owned or used by the utility to provide utility services.

    e.  Uses or receives the direct benefit of all, or a portion, of the utility service with knowledge of, or reason to believe that, the diversion, tampering, or unauthorized connection existed at the time of the use, or that the use or receipt, was without the authorization or consent of the utility."

138.     By causing the introduction of PFOS and/or PFOA, or their chemical precursors, into Plaintiff's wells and the groundwater that supplies those wells, Defendants injured, altered, interfered with, and/or otherwise prevented property owned or used by Plaintiff from performing its normal or customary function in Plaintiff's provision of utility services.

139.    As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFOS, PFOA and/or their precursor chemicals, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

140.    "In any civil action brought pursuant to Section 1882.1, the utility may recover as damages three times the amount of actual damages, if any, plus the cost of the suit and reasonable attorney's fees."  California Civil Code Section 1882.2.

### TENTH CAUSE OF ACTION

VIOLATION OF THE UNIFORM VOIDABLE TRANSFER ACT

141.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

142.    Plaintiff seeks equitable and other relief pursuant to the Uniform Voidable Transfer Act ("UVTA") as adopted by the State of California in Cal. Civ. Code Ann. § 3439, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (collectively, the "UVTA Defendants").

143.    Pursuant to Cal. Civ. Code Ann. § 3439, "[a] transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

a.  With actual intent to hinder, delay, or defraud any creditor of the debtor;

b.  Without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor either:

    i.   Was engaged or was about to engage in a busines or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

    ii.   Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

144.    Further, Cal. Civ. Code Ann. § 3439 states that, "[i]n determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any and all of the following: to all relevant factors including, but not limited to, the following: […] whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; whether the transfer was of substantially all of the debtor's assets; […] whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

145.    Upon information and belief, in February 2014, E. I. DuPont de Nemours and Company formed The Chemours Company as a wholly-owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

146.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

147.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

148.     The UVTA Defendants acted with actual intent to hinder, delay and to defraud any creditor of the UVTA Defendants because: (1) they were engaged and or about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business and; (2) intended to incur, or believed or reasonably should have believed or reasonably should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

149.     The UVTA Defendants engaged in actions in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of Plaintiff, and other similar parties, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions described herein.

150.     As a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

151.     Pursuant to Cal. Civ. Code Ann. § 3439.07, Plaintiff seeks avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiff in this action.

152.     Plaintiff further seeks all other rights and remedies that may be available to it under UVTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## PUNITIVE DAMAGES

153.      Under the applicable laws of the State of California, Plaintiff seeks punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:

    a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;

    b. costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Plaintiff's Property;

    c. costs and expenses associated with and related to the removal and disposal of the contamination; and

    d. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property.

2. Diminution of property value;

3. Consequential damages;

4. Punitive damages;

5. Costs, disbursements, and attorneys' fees of this lawsuit;

6. Pre-judgment and post-judgment interest; and

7. Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: October 27, 2020

Scott Summy (TX Bar 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal (TX Bar 13569600)
Carla Burke Pickrel (TX Bar 24012490)
Cristina Sanchez (TX Bar 24041856)
John Fiske (CA Bar 24256)

**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr. (LA Bar 1788)
Darren Sumich (LA Bar 23321)
David A. Parsiola (LA Bar 21005)
Brandon J. Taylor (LA Bar 27662)
Christina M. Cossich (LA Bar 32407)
Andrew J. Cvitanovic (LA Bar 34500)
Luana N. Smith (LA Bar 35534)

*Attorneys for Plaintiff*

36